**CHICAGO MERCANTILE EXCHANGE, Plaintiff,**

v.

**UNITED STATES of America, Defendant–Appellant,**

and

**GNP Commodities, Inc., Defendant–Appellee.**

No. 87–1316.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 4, 1987.

Decided Feb. 22, 1988.

Before CUDAHY and COFFEY, Circuit Judges, and NOLAND, Senior District Judge.*

CUDAHY, Circuit Judge.

Chicago Mercantile Exchange ("CME") brought this interpleader action under 28 U.S.C. § 1335 (1982), naming as defendants the United States and GNP Commodities, Inc. ("GNP"). Bruce Yermack, a CME member, owed more than $274,000 in federal income taxes; he also owed GNP over $93,000 in CME exchange-related debt. CME holds $166,361.57 in proceeds from the involuntary sale of Yermack's seat on the exchange. CME instituted this action to resolve conflicting claims to the proceeds. The district court found for GNP, in an opinion reported at 650 F.Supp. 141 (N.D.Ill.1986). The government appeals. We affirm.

## I.

The relevant facts are not in dispute. The Internal Revenue Service (the "IRS"), on October 9, 1985, served a Notice of Levy on CME, levying on all property or money in CME's possession belonging to Yermack. The IRS claimed a tax lien on Yermack's property up to $274,672.29, under 26 U.S.C. § 6321 (1982).[1]

In addition to his federal tax liability, Yermack incurred a substantial debt to GNP. GNP was the clearing member of the exchange responsible for Yermack's trades. Among other responsibilities, "[i]n the event that an original party to a contract defaults on his obligation to answer margin calls or to make or take delivery, it is the duty of the clearing *member* to satisfy its customer's obligations." I P.M. Johnson, *Commodities Regulation* § 1.31 (1982) (emphasis in original). Yermack

Jane S. Kimball, Asst. Atty. Gen., Appellate Sec. Tax Div., Dept. of Justice, Roger M. Olsen and William S. Estabrook, Asst. Attys. Gen., Washington, D.C., for defendant-appellant.

Jerrold E. Salzman, Freeman, Freeman & Salzman, Kenneth F. Levin, Law Office of Kenneth F. Levin, Chtd., Chicago, Ill., for defendant-appellee.

* The Honorable James E. Noland, Senior District Judge of the Southern District of Indiana, is sitting by designation.

1. Section 6321 reads:
    If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.
    26 U.S.C. § 6321 (1982).

owed GNP $93,670.57 in exchange-related debts.

GNP claims that CME rules grant it priority to the proceeds from the seat's sale. Yermack's property interest in the CME seat is determined by CME rules, approved by the Commodity Futures Trading Commission under the Commodity Exchange Act, 7 U.S.C. §§ 1–24 (1982 & Supp.1986). CME Rule 100 states:

> Membership in the Exchange is a personal privilege subject to purchase, sale, and transfer only as authorized and on the conditions prescribed herein. A member shall have no rights in or to the membership or the proceeds of the sale of such membership except as specifically granted herein.

Brief for Appellant at 6a. The exchange rules contain an elaborate transfer mechanism by which CME sells the membership and distributes the proceeds. *See* CME Rules 103–110, Brief for Appellant at 6a–16a. To begin voluntary or involuntary transfer of membership, the exchange first locates a prospective buyer, who must forward a check payable to the exchange. CME Rule 105, Brief for Appellant at 7a. The exchange must approve the transfer. *See* CME Rules 107–108, Brief for Appellant at 13a. If the transfer is approved, the exchange distributes the proceeds under CME Rule 110, Brief for Appellant at 14a–15a.

Rule 110 sets up a priority scheme for internal exchange claims.[2] The seller is entitled only to the remainder, if any, of the proceeds after the internal claims are paid. Under CME rules, this remainder is the full extent of his property interest in the seat.

Thus, we are presented with a classic confrontation: two parties claim an interest in the same limited pot. GNP argues that Yermack had no interest in the proceeds to which the tax lien could attach until after Rule 110 claims were satisfied. The IRS, on the other hand, argues that since Yermack had *some* interest in the seat, the lien could attach to the entire proceeds and Rule 110 claimants are simply unperfected secured creditors whose claims are subordinate to the tax lien under 26 U.S.C. § 6323 (1982). According to this argument, in order to prevail over a tax lien, Rule 110 creditors would have to file financing statements to perfect their "security interests" under local law. Further, the IRS argues that even if CME Rule 110 gives GNP's claim priority, that rule must give way to the paramount federal interest in collecting taxes. This argument is based on the premise that Rule 110 conflicts with the language or purposes of federal tax lien law.

The district court rejected the government's arguments, finding that Yermack's interest in the property was limited to the net proceeds after payment of Rule 110 claims and holding that the government's lien attached only to that remainder.

---

2. In pertinent part, Rule 110 states:

The proceeds of the sale of a membership shall be applied to the following purposes and in the following order of priority:

. . . .

b. Payment of any indebtedness to the clearing member who last qualified the selling member arising out of a pledge of such membership as collateral security on such indebtedness, or a deficit which the President determines to have arisen directly out of futures transactions on the Exchange;

c. Payments of amounts due to members and other clearing members on claims filed which the President determines to have arisen directly out of futures transactions on the Exchange;

. . . .

e. No other claims against the proceeds of the sale of a membership shall be recognized and administered by the Exchange, but the creditors of the seller of a membership not falling in the foregoing categories may pursue other legal means of securing payment of their obligations.

. . . .

Distribution of proceeds shall be made by the payment of claims in the categories listed in this rule to the extent the proceeds from the sale are sufficient to meet those obligations.

. . . . .

The surplus, if any, shall be paid to the person whose membership was sold or his legal representative upon the execution of a satisfactory release. The President's determination and allowance of claims hereunder shall be final.

CME Rule 110, Brief for Appellant at 14a–16a.

## II.

■ The government's argument in this case has great surface appeal. It is axiomatic that section 6321 reaches "every interest in property that a taxpayer might have." *United States v. National Bank of Commerce*, 472 U.S. 713, 720, 105 S.Ct. 2919, 2924, 86 L.Ed.2d 565 (1985). It is also clear from the statute's face that a perfected tax lien has priority over a prior unperfected security interest. *See* 26 U.S.C. § 6323 (1982); *see also infra* p. 1357 n. 5. We do not dispute these statements of the applicable law; however, they do not in themselves compel judgment for the government.

The government's position requires us to accept two propositions. First, we must find that the tax lien attached to the entire membership proceeds. Second, we must find that GNP's interest was an unperfected security interest in the seat. Careful analysis shows that neither proposition is true.

The initial question in this case is not whether an unperfected security interest prevails over a properly filed tax lien; rather the issue is whether Yermack, the taxpayer, had any interest in the proceeds. Section 6321 states that a tax lien attaches to "all property and rights to property, whether real or personal, belonging to [the taxpayer]." 26 U.S.C. § 6321 (1982); *see also supra* p. 1353 n. 1. The lien attaches only to property "belonging to" the taxpayer.

■ The nature and extent of the taxpayer's property interest is a matter of state law. *See National Bank of Commerce*, 472 U.S. at 722, 105 S.Ct. at 2925; *United States v. Rodgers*, 461 U.S. 677, 683, 103 S.Ct. 2132, 2137, 76 L.Ed.2d 236 (1983); *United States v. Bess*, 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135 (1958); *see also Avco Delta Corp. Canada Ltd. v. United States*, 459 F.2d 436, 440 (7th Cir.1972) ("a federal court must look to state law to determine the nature of the legal interest which the taxpayer had in the property sought to be reached"). As the Supreme Court explained in *Bess*, section 6321 "creates no property rights but merely attaches consequences, federally defined, to rights created under state law." *Bess*, 357 U.S. at 55, 78 S.Ct. at 1057; *see also Rodgers*, 461 U.S. at 683, 103 S.Ct. at 2137. In the case before us, we must look to the CME rules creating the property right to determine the attributes of that property.

■ The government urges us to hold that, because Yermack has an interest in *some* of the proceeds, a tax lien can attach to the *entire* amount. We reject that contention as inconsistent with the plain language of the statute and the Supreme Court's statements on the subject. Indeed, the Court has stated that "if [the statute] allowed for the gratuitous confiscation of one person's property interests in order to satisfy another person's tax indebtedness, such a provision might pose significant difficulties under the Due Process Clause of the Fifth Amendment." *Rodgers*, 461 U.S. at 697, 103 S.Ct. at 2144. The tax lien can attach to Yermack's interest in the membership proceeds, but to nothing beyond that interest.

## III.

■ A more plausible government argument is that Yermack had an interest in the entire proceeds, so the tax lien could attach to the whole. Unfortunately for the IRS, the Supreme Court has consistently held that the seller of an exchange seat has only an interest in property *subject to* the exchange rules, including exchange priority rules. *See Board of Trade v. Johnson*, 264 U.S. 1, 12, 44 S.Ct. 232, 234, 68 L.Ed. 533 (1924); *Hyde v. Woods*, 94 U.S. (4 Otto) 523, 525, 24 L.Ed. 264 (1877); *see also In re Sorkin*, No. 86 B 1905, slip op. at 10 (Bankr.N.D.Ill. Nov. 26, 1986) (facts identical to this case).

The *Hyde* case is especially apposite and essentially controls the case before us. In *Hyde*, a trustee in bankruptcy tried to override an exchange rule identical in effect to

CME Rule 110.[3] The Court upheld the rule, explaining that the debtor's rights in the seat were defined by the exchange rules:

> A seat in this Board is not a matter of absolute purchase. Though we have said it is property, it is encumbered with conditions when purchased, without which it could not be obtained.... The rule entered into and became an incident of the property when it was created, and remains a part of it into whose hands soever it may come. As the creators of this right—this property—took nothing from any man's creditors when they created it, no wrong was done to any creditor by the imposition of this condition.

*Hyde*, 94 U.S. at 525. The rules of the exchange *create* the property and they govern its attributes. The Court reiterated this holding in the landmark *Johnson* case. *See* 264 U.S. at 12, 44 S.Ct. at 235 ("By operation of the bankruptcy law, the membership passes, *subject to rules of the Exchange*, to the trustee.") (emphasis added).

Both *Hyde* and *Johnson* arose in the bankruptcy context. Their property analysis is, however, in no way limited to that context and must apply with equal force in a tax lien context.[4] Both *Hyde* and *Johnson* found that the holder of an exchange seat holds that seat subject to the exchange rules, which define and limit his property interest. If he has no property right beyond that granted by the exchange rules, then he has no further property right to which a tax lien can attach. *See In re Sorkin*, slip op. at 10.

This conclusion is reinforced by analysis of the rules at issue here. Specifically, CME Rule 100 states: "A member shall have no rights in or to the membership or the proceeds of the sale of such membership except as specifically granted herein." Brief for Appellant at 6a. This rule puts the world on notice. Before purchasing his seat, Yermack undoubtedly checked the exchange rules to determine what he was buying. Likewise, any lender taking the seat as security would check the rules to determine the value of that security. On so doing, he or she would find that the conjunction of Rules 100 and 110 limits Yermack's property right to an interest in those proceeds remaining after satisfaction of Rule 110 claims. That is the only interest Yermack had in the seat; so it is the only interest on which the IRS could levy.

## IV.

This conclusion finds further support in several Supreme Court tax lien decisions. In *United States v. Bess*, 357 U.S. 51, 78 S.Ct. 1054, the taxpayer was insured under a life insurance policy. A tax lien attached prior to his death and the IRS brought suit against the policy beneficiary for the entire proceeds. *Id.* at 52, 78 S.Ct. at 1056. The Court held that the taxpayer's interest in the policy was defined by the policy terms as enforced by state law. *Id.* at 55, 78 S.Ct. at 1057. Since, under the policy, the insured could only force the insurer to pay him the policy's "cash surrender value," that was the only property interest to which the tax lien could attach. *Id.* at 56, 78 S.Ct. at 1058.

*Bess* is analogous to this case. Yermack could request CME to sell his seat. When the exchange did so, however, he would receive only the net proceeds after Rule 110 claims were paid. The exchange rules here are like the insurance policy in *Bess*. They create the property right and define its attributes. In *Bess*, to ignore those limits would have been to redefine the property so as to take it from its owner, the policy beneficiary, and give it to the IRS. That would raise great constitutional difficulties. *See Rodgers*, 461 U.S. at 697, 103 S.Ct. at 2144. Those difficulties are

---

3. The exchange rule at issue in *Hyde* stated: In sales of seats for accounts of delinquent members, the proceeds shall be applied to the benefit of the members of this Board exclusive of outside creditors, unless there shall be a balance after payment of the claims of members in full.

*Hyde*, 94 U.S. at 524.

4. Indeed, at oral argument the government admitted it was unable to distinguish the property analysis in *Hyde* and *Johnson* from this case.

also inherent in the government's position here.

Another analogous case is *United States v. Durham Lumber Co.*, 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371 (1960). Under the North Carolina law at issue in *Durham Lumber*, any money owed by a building owner under a construction contract had to be used first to satisfy subcontractors' claims of which the owner had notice, up to the amount owed the subcontractors by the general contractor. *Id.* at 525, 80 S.Ct. at 1283. The Court held that, based on this statute, a tax lien against the general contractor's property did not extend to the full face amount of a building contract, but only to the net proceeds after subcontractor claims were paid. *Id.* As with *Bess*, the analogy to the present case is clear and powerful. The position of the subcontractors in *Durham Lumber* is identical to GNP's position here. The tax lien attaches only to those proceeds remaining after satisfaction of GNP's Rule 110 claim.

This conclusion also answers the government's preemption argument. The IRS contends that Rule 110 must give way to the paramount federal interest in collecting taxes. This *might* be true if Rule 110 conflicted with the tax lien statute; however, as shown above, there is no conflict. Rule 110 is simply part of the property definition and the statute only reaches Yermack's interest in the property. *Cf. Hyde*, 94 U.S. at 525.

**5.** The pertinent part of § 6323 reads:

(a) The lien imposed by section 6321 shall not be valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary.

....

(b) Definitions.—For purposes of this section

...—

(1) Security interest.—The term "security interest" means any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability. A security interest exists at any time (A) if, at such time, the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with money or money's worth.

**V.**

Two other government contentions deserve brief comment. First, the IRS argues that GNP's interest is nothing more than a run-of-the-mill unperfected security interest in the proceeds. If so, the tax lien takes priority because, under section 6323, a filed tax lien prevails over a security interest unless that interest is choate and perfected. 26 U.S.C. § 6323 (1982).[5]

The government's argument here misses the mark once again. As recognized in *Hyde*, 94 U.S. at 525–26, the Rule 110 creditor is not a secured creditor. The Supreme Court distinguished exchange priority rules on the ground that those rules are attributes of the property at its creation. *Id.* This is not a case "where a man has done this with property which was his own, property on which he himself imposed the direction or the incumbrance, which impeded creditors." *Id.* Instead, the rule was an incident of the seat when Yermack bought the membership; it preexisted his interest and will survive so long as the seat exists. It is an incident of the property, not a lien on that property.[6]

Turning to less formalistic concerns, the government's final argument is that upholding the district court's decision will create a giant loophole in the statute, allowing creditors to evade its grasp by disguising

26 U.S.C. § 6323 (1982).

The import of this section, in plain language, is that a prior perfected, choate security interest has priority over a tax lien.

**6.** The government cites language from *Johnson* that purportedly shows that the Supreme Court considered the creditor member's interest a "lien". The *Johnson* Court does state that the creditor's interest is "in some respects similar to the typical lien of the common law." 264 U.S. at 11, 44 S.Ct. at 234. Still, the very next sentence states that the right "differs, however, from the common law lien." *Id.* Later, the distinction is made clear: "The lien, if it can be called such, is inherent in the property at its creation, and it can be asserted at any time before actual transfer." *Id.* at 15, 44 S.Ct. at 236. Thus, *Johnson* supports *Hyde* and our decision in this case.

security interests as property attributes. There are several answers to this contention. First, our holding is very narrow. We only reiterate the Supreme Court's holding that property rights in an exchange membership are determined by the exchange rules. In this case, that translates to a holding that the tax lien attaches only to those proceeds remaining after all Rule 110 claims are settled.

Second, this has been the law in the bankruptcy context for over one hundred years, at least since the *Hyde* decision. *Bess* and *Durham Lumber*, analogous tax lien cases, did not result in a torrent of deceptive activity.[7] If they had, Congress would have amended the statute to correct the problem. Indeed, apparently the IRS did not decide to challenge exchange priority rules in the tax lien context until recently. The only other case directly to decide the point before us is *In re Sorkin*, decided in 1986.

Third, and most important, the statute compels the result we reach today. If Congress wished the statute to reach property *not* "belonging to" the taxpayer, it could have worded the statute to achieve that result. Perhaps recognizing the dubious constitutionality of such a statute, Congress enacted a more limited proposal. The Supreme Court has construed the statute to respect state law property definitions, and we do likewise.

## VI.

We once again emphasize the narrow scope of our holding. The Supreme Court, in *Hyde* and *Johnson*, held that exchange priority rules are incidents of the membership interest at its inception. In *Bess*, the Court held that the tax lien statute does not alter property interests; therefore, the lien in this case attached only to Yermack's interest in the property, which consisted of

the net proceeds after satisfaction of Rule 110 claims. We therefore affirm the district court's judgment.

AFFIRMED.

COFFEY, Circuit Judge, concurring.

Because I agree that the Supreme Court's 111–year-old decision in *Hyde v. Woods*, 94 U.S. (4 Otto) 523, 24 L.Ed. 264 (1887)—holding that the owner of a seat on an exchange does not have a "property interest" in proceeds from the sale of the seat to which a federal tax lien may attach —controls the outcome of this case, I reluctantly join in the majority's conclusion. Nevertheless, I am convinced that because the majority's opinion uncritically accepts the proposition that the rules of a private organization (the Chicago Mercantile Exchange) operate to define a taxpayer's "property interest" in a seat on the Exchange in such a way as to defeat a federal tax lien, the opinion will serve to encourage abuses of the federal tax lien priority system set forth in § 6323. The potential for litigants to attempt an "end run" around the federal tax lien laws is encouraged by the majority's implicit conclusion that state property law (or even private contractors) have the ultimate authority to determine the nature of the legal interest which the taxpayer has in the property sought to be reached by a federal tax lien. I therefore write separately in an attempt to delineate the limits of today's decision.

Yermack, the delinquent taxpayer, is the holder of a seat on the Chicago Mercantile Exchange ("CME") and owes money to the federal government for unpaid taxes, as well as to GNP Commodities, Inc. (the individual "clearing member" of the exchange responsible for Yermack's trades). The government's lien—filed prior to GNP's perfection of its interest—is asserted against Yermack's "property interest" in

---

7. Indeed, when asked at oral argument for an example of how the district court's decision could be abused in other contexts, the government failed to come up with any plausible example. The one hypothetical proposed was that a condominium association could draft rules stating that no member could sell his or her unit without paying off debts to other members.

This example actually lends credibility to our decision: such a rule would *not* have priority over a tax lien on the condominium unit, since the rule is *not* an attribute of the unit under state law. It is merely a consensual security interest created later, and would therefore not prevail over a filed tax lien. *Cf. Rodgers*, 461 U.S. at 683, 103 S.Ct. at 2137.

the proceeds from the seat's sale. Since GNP admittedly failed to take the steps necessary to perfect a security interest in the proceeds prior to the government's filing of its notice of tax lien on October 9, 1985, there is no question that if GNP were considered a secured creditor of Yermack, the government's lien would prevail.

As the majority explains, however, "[t]he initial question in this case is not whether an unperfected security interest prevails over a properly filed tax lien [it would not]; rather the issue is whether Yermack, the taxpayer, had any [property] interest in the proceeds" to which the federal tax lien might attach. Answering this question, the majority broadly asserts that the "nature and extent of the taxpayer's property interest is a matter of *state law*," (citing *Avco Delta Corp. Canada Ltd. v. United States*, 459 F.2d 436, 440 (7th Cir.1972)) (emphasis added) and that "§ 6321 '[creates no property rights but] merely attaches consequences, federally defined, to rights created under state law.'" (Quoting *U.S. v. Bess*, 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135 (1958)). From this premise, the majority, relying on *Hyde*, but without a thorough analysis, concludes that: (1) CME priority rules (the rules of a *private* organization) determine the attributes of Yermack's property rights in the proceeds from the sale of his seat on the exchange; and that (2) under those rules, the property interests of a holder of an exchange seat are limited to an interest in those proceeds remaining *after* satisfaction of clearinghouse member claims. Thus, it is said that Yermack has no "property interest" in such proceeds to which a federal tax lien could attach.

Initially, I am disturbed by the majority's somewhat freewheeling leap in logic from the questionable premise that for federal tax purposes, state property law "determine[s] the nature of the legal interest which the taxpayer had in the property sought to be reached," *Avco*, 459 F.2d at 440, to the conclusion that a private organization such as the CME has the power to promulgate rules that essentially redefine the attributes of "property" so as to defeat a federal tax lien. This is the result of the

court's holding today. Under Illinois judgment lien law, a membership on the CME has many of the attributes of a traditional "property interest" and is considered "intangible personal property" of the seatholder. *See In re: Rochford*, 91 Ill.App.3d 769, 777, 46 Ill.Dec. 943, 949–50, 414 N.E. 2d 1096, 1102–03 (1980); *Nelson v. Board of Trade*, 58 Ill.App. 399, 414 (1895) (membership on the Chicago Board of Trade is "property" with a "regular pecuniary market value."). But nothing in either federal or Illinois law authorizes the CME to alter or redefine that interest in order to avoid a federal tax lien. Nevertheless, the holding today is that a private exchange may set rules that define the extent of a seatholder's property interest so as to avoid the attachment of a federal tax lien. Although the majority downplays the impact of its ruling, the logical extension of this reasoning is that secured parties could legitimately defeat the federal priority scheme merely by privately contracting to enact rules, bylaws, and/or procedures that redefine an ordinary security interest as an "incident of ownership." Furthermore, even if the majority opinion is strictly limited to allowing only state property law to determine the attributes of a creditor's legal interest in the taxpayer's property, *see Avco*, 459 F.2d at 440, a serious danger to the authority of the federal tax lien system still exists: state legislators might conceivably attempt, with the urging of private interest groups, a formalistic redefinition of state law to divest the taxpayer of "property rights" in order to give preference to a particular creditor. Other courts, recognizing this precise danger, have pointed out that the Supremacy Clause of the United States Constitution very properly enters the picture when state law (or private contracts) purport to so redefine the attributes of property in derogation of the federal priority scheme. *See, e.g., Crocker National Bank v. Trical Manufacturing Company*, 523 F.2d 1037, 1039 n. 2 (9th Cir.1975) ("[t]he state definition of property interests ... is simply the definition of the relationship of conflicting parties with regard to the same piece of property. The

tax lien law does the same thing. So long as the state recognizes some rights in relation to the property in the taxpayer, the Supremacy Clause enters to give the government whatever priorities Congress has deemed proper."). Thus, while a state statute (or an exchange's rules) may *say* the taxpayer has "no interest," I believe a federal question remains as to whether or not merely saying so operates to defeat a federal tax lien. Justice Harlan, dissenting in *Aquilino v. United States,* 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960), and *U.S. v. Durham Lumber Co.,* 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371 (1960), makes this point most cogently in a case where a state law, in an effort to give preference to subcontractors when a claim is made against the owner of a project, purported to redefine the property rights of a general contractor in claims against the owner. Justice Harlan stated:

> "*I cannot see how it makes any difference, for purposes of the federal tax-lien statute, whether state law purports to prefer subcontractors over the general contractor and parties claiming through him by giving the subcontractors a lien on the general contractor's right of action against the owner or by giving them a prior right to collect the debt itself.* In both instances, the owner is under a contractual duty to pay the general contractor and the latter is under a contractual duty to pay the subcontractors. In both instances, the subcontractors are attempting to satisfy their claims against the general contractor. And in both instances, they are seeking to satisfy themselves by claiming precisely the same thing—a prior right in the proceeds of the debt which arises by virtue of the contractual relationship between the owner and the general contractor. In neither instance can the subcontractors collect more than that to which the subcontract entitles them, and in neither can the owner be required to pay more than that to which the main contract obligates him. *If federal law requires that subordination of the general contractor's interest be ignored in the one instance, it does so equally in the other.*

The Bess case does not require a contrary conclusion. That case held only that while a federal tax lien attached to the cash surrender value of a life insurance policy owned by the taxpayer, it did not attach to the proceeds paid on his death, because under state law he had no right to such proceeds during his life. There was no reason under those circumstances why state property concepts should not control. To read that case as standing for the proposition that such concepts must also be controlling in cases such as these defeats the rule that '[t]he relative priority of the lien of the United States for unpaid taxes is ... always a federal question to be determined finally by the federal courts.' *United States v. Acri,* 348 U.S. 211, 213, 75 S.Ct. 239, 241, 99 L.Ed. 264 [1955]. It is one thing to say, as the Court did in Bess, that the federal interest in uniform application of federal tax liens does not require, as a general rule, that state property concepts be disregarded. It is quite another to permit such concepts to control the extent of a federal lien's application in situations indistinguishable from those where the Court has in fact, rightly or wrongly, enforced a uniform federal rule. *Given federal supremacy in this field, it surely cannot be that the federal courts may not appraise for themselves the true impact of state-created rights upon the priority of federal tax liens within the criteria established by this Court. Cf. Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 [1930]; *City of Detroit v. Murray Corporation,* 355 U.S. 489, 492, 78 S.Ct. 458, 460, 2 L.Ed.2d 441 [1958]. *To recognize the substantial equivalence of the situations is not to create a new rule of federal property law but to require an evenhanded application of an already established one.*"

363 U.S. at 517–21, 80 S.Ct. at 1286–87 (emphasis added) (footnotes omitted).

In this era of fiscal responsibility due to a national debt that is beyond comprehension, the public's interest in collecting over-

due taxes is greater than ever before. The federal tax lien laws were passed with this goal in mind, and with the assumption that the general tax lien outranks all competing interests in the taxpayer's property. *See* Young, *Priority of the Federal Tax Lien*, 34 U.Chi.L.Rev. 723 (1967). Hence, while state property concepts should not be disregarded, we must be extremely vigilant not to allow either state law or private parties to circumvent these important federal policies by attempting to formalistically redefine and codify through rules, regulations, and/or bylaws an ordinary security interest as an incident of property ownership, thereby defeating a valid tax lien that would otherwise take priority. Not only does the Supremacy Clause prohibit such a result, but to allow state law (or private parties) to provide for varying definitions of a taxpayer's ownership interests would mean that subsequent cases must turn on the elusive distinction between diminishing a greater property interest (by way of a "lien" or security interest) and initially conferring a lesser one (by limiting the taxpayer's "property interest"). Dubious distinctions of this nature should never be allowed to emasculate the priorities embodied in the federal tax lien statute. Therefore, in light of the strong federal policies implicated by this decision, I believe that it may well be time for the Supreme Court to reexamine its decision in *Hyde* —holding that the priority rules of an exchange constitute incidents of the seatholder's property rights. In any event, I am convinced that the majority's opinion must not be read to extend beyond the specific facts of this case.